1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    JOSE A. ROSAS,                          Case No. 13-cv-05787-HSG (PR)

              Petitioner,
8                                            ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS;
9         v.                                 DENYING CERTIFICATE OF
                                             APPEALABILITY
10   JOHN RATHMAN, Warden,

              Respondent.
11

12

13        Before the Court is the above-titled *pro se* petition for a writ of habeas corpus, filed

14   pursuant to 28 U.S.C. § 2254 by petitioner Jose A. Rosas, challenging the validity of a judgment

15   obtained against him in state court.  Respondent has filed an answer to the petition.[1]  Petitioner has

16   filed a traverse.  For the reasons set forth below, the petition is denied.

17                              I.  PROCEDURAL HISTORY

18        In May 2009 in San Francisco Superior Court, a jury found petitioner guilty of two counts

19   of forcible sexual penetration (Cal. Penal Code § 289(d)(3), (4)), elder abuse (*id*. at § 368(b)(1)),

20   misdemeanor sexual battery (*id*. at § 243.4(e)(1)), multiple counts of simple assault (*id*. at § 240),

21   and the unlawful dissuasion of a witness (*id*. at § 136.1(b)(1)).  CT at 366-68, 371-76, 386-96.[2]

22   On August 30, 2010, the trial court sentenced petitioner to 10 years and 8 months in state prison.

23

24   _____

     [1] Petitioner initially named Brian Duffy, former warden of California Medical Facility, as the
25   respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, John
     Rathman, the current warden of Imperial Regional Detention Facility, where petitioner is currently
26   incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

27   [2] All references herein to exhibits are to the exhibits submitted by respondent in support of the
     answer, unless otherwise indicated.  References to "CT" and "RT" are to the Clerk's Transcript
28   and Reporter's Transcript of the state proceedings, Exs. 1 and 2, respectively.

United States District Court
Northern District of California

1   CT 670-74.

2       Petitioner filed both a direct appeal and a habeas petition in the California Court of Appeal.

3   On May 31, 2012, the California Court of Appeal struck the sentences on two of the simple assault

4   convictions but otherwise affirmed the judgment. Ex. 6. The court of appeal denied the habeas

5   petition for failure to state a prima facie case for relief. *Id.* The California Supreme Court

6   summarily denied review of the direct appeal on August 8, 2012. Ex. 8.

7       Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court,

8   which was summarily denied on December 12, 2012. Ex. 10.[3]

9       On December 13, 2013, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

11      The following background facts describing the crime and evidence presented at trial are

12  from the May 31, 2012 opinion of the California Court of Appeal[4]:

### Background

14      [Petitioner] was charged with various sexual and related offenses against five women:
    Claudia, Maria, Glenda, M., and A. The jury acquitted him of the charges related to M.,
    convicted him on the charges related to A., Claudia, and Maria, and deadlocked on the
    charges concerning Glenda. [FN 1] The women gave the following accounts of their
    encounters with [petitioner].

        FN 1: To protect their privacy, and intending no disrespect, we will refer to the
        patients who testified against [petitioner] by only their first names.

### Claudia

    Claudia came to the United States from Nicaragua in 1994, when she was in her thirties.
    On July 8, 2002, she went to St. Luke's Hospital because she was experiencing intense
    back pain. Her regular doctor was unavailable, so she saw [petitioner] instead.

    [Petitioner] first asked Claudia about her age, family and past surgeries. He told her to
    lie down on the table, unhook her bra and lift her blouse so he could examine her

---

[3] Petitioner represents that he also filed a petition for writ of habeas corpus in San Francisco Superior Court. *See* Pet. at 4-5. However, a search of petitioner's name on the official government website of the San Francisco Superior Court yields no habeas proceedings brought by petitioner. And the parties submit no record of any such petition.

[4] This summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254 (e) (1).

breasts.  Claudia felt tense and scared.  It seemed strange to her that [petitioner] asked her to lift up her bra and did not provide her with a gown or drape.  Then, after he examined her breasts, [petitioner] told Claudia to lower her pants and underwear to her knees.  He said she had a problem with her spine, instructed her to get on her elbows and knees with her buttocks in the air, and said he was going to conduct an anal and vaginal examination.  Claudia said that her gynecologist had already done this, but [petitioner] said he had to do a "complete examination."  He put on gloves, turned on a lamp, stuck his fingers into Claudia's vagina and touched "all sides" of her vagina.  He did not touch or palpate her stomach.  This continued for some minutes, far longer than any pelvic exam Claudia had experienced.  It hurt, and Claudia said "ouch." [Petitioner] responded that it must hurt when she had sex because she was very tight. No doctor had ever said anything like that to her or examined her in this manner.

After what felt like a long time, [petitioner] took his fingers out of Claudia's vagina, changed his gloves, and put his finger or fingers in her anus.  Again, this seemed to last a "long, long time."  [Petitioner] asked Claudia "whether his fingers come in from behind, whether I could feel my vagina."  She did not respond.  She was feeling awful and wanted to kick [petitioner], but she was unable to react.  Finally, [petitioner] removed his fingers and wiped Claudia with a tissue; Claudia felt like "a mare, like an animal."  Then, with Claudia still in the same position, [petitioner] massaged her back. He said he was not a chiropractor, but that the massage would help her.  He said he "hoped that the complete examination that he had given" her was "better than the one [her] gynecologist gave [her]."  He also told her that her problem was a compressed muscle and that she should return in two weeks.

Claudia was picked up outside the hospital by her friend Maria V. and Claudia's son. Claudia was crying.  As they drove away, Maria asked her what was wrong.  Claudia did not want to explain what had happened in front of her son, so she lied and said the doctor had given her an injection.  Then she told Maria to stop the car so they could talk.  Once outside of the parked car, she told Maria what [petitioner] had done.

The next day Claudia reported [petitioner]'s actions to St. Luke's.  She also made a report to the police, who escorted her to San Francisco General Hospital for a sexual assault exam.  The chief of medicine at St. Luke's spoke with [petitioner] about Claudia's complaint the following day.  He told [petitioner] the examination had not been in keeping with usual and customary practice, and advised him to use the conventional lithotomy position and have a chaperone present during future pelvic exams.

### *Maria*

Maria was born in Brazil in 1936.  [Petitioner] was her family doctor.  On March 21, 2005 she went to see him about shoulder pains.  [Petitioner] suggested a PAP smear. Maria told him her gynecologist in Brazil had given her a PAP smear just two years before, but she was willing to have another if it was necessary.  Without providing a gown or drape, [petitioner] lifted Maria's blouse and bra and examined her breasts and belly.  He commented that plastic surgery on both areas was well done.

United States District Court
Northern District of California

[Petitioner] then had Maria lower her pants and underwear and put her feet up in stirrups for the examination.  He touched her clitoris very lightly with his bare hand.  Then he put on gloves, put his finger or fingers in her vagina, and moved them around and back and forth inside of her.  It was very uncomfortable.  Maria was "shocked" and "dying of shame."

[Petitioner] then told Maria to lie face down on her knees and forearms with her buttocks in the air.  She complied because he was her doctor, and she trusted him.  [Petitioner] inserted a finger or fingers in her vagina and moved them around and back and forth as before.  This lasted at least two minutes, and it was painful.  Maria was "in a state of shock."  After [petitioner] touched her "many times," Maria turned onto her side, put her legs together and said "no."  [Petitioner]'s gloves were "full of blood."  Maria said "that's not right."  Seeing that she was upset, [petitioner] checked her pulse and told her everything was fine.  He did not use a speculum, perform a PAP smear or collect any samples for laboratory analysis.

Maria was "very scared" as she left [petitioner]'s office.  When she arrived home she was cramping and there was blood on her underwear.  The next morning, still in some pain, she went to St. Luke's emergency room to find out what had happened to her.  She asked to see a female gynecologist, but because none were available she agreed to meet with Dr. Marc Snyder.  Maria asked Dr. Snyder to conduct a gynecological examination, but told him she would not explain why she wanted the exam until he finished.  This examination was notably different than [petitioner]'s.  Maria was covered with a cloth, a nurse put her in the standard lithotomy position on the examination table, and Dr. Snyder sat in front of her as two nurses held her hands to calm her.  Unlike [petitioner], he used a speculum to look in her vagina and did not insert his fingers.  It was over very quickly.

Maria then told the doctor about her experience with [petitioner] the previous day.  Dr. Snyder brought in a female gynecologist, Dr. Nicol, who also briefly examined Maria.  Dr. Nicol noted a two centimeter laceration in the posterior of Maria's vulva, blood clots, and bruises on both sides of her periurethral area.  This was highly unusual and would not be caused by an ordinary pelvic examination, particularly since Maria's vagina was able to accommodate a normal-size speculum.  Dr. Nicol opined it would require the insertion of three or four fingers to cause this type of injury.

After some initial reluctance, Maria agreed to make a police report and was given a sexual assault (or "SART") examination.  The nurse practitioner who conducted the exam noted four areas of injury in Maria's vaginal area, including bruises, redness, and a laceration.

St. Luke's suspended [petitioner]'s medical privileges pending investigation of Maria's complaint.  On March 24, during an interview with San Francisco Police Inspector Frank Lee, [petitioner] wrote a letter of apology to Maria.  He wrote: "I want to apologize for the inappropriate exam, and I feel very sorry that you felt humiliated at this time.  I am crying the same that you.  I learned from what happened that I am going to be a better person from today.  I want you to forgive me for what I have caused.  I want you to be as before and give me the lesson of my life.  Sincerely, Jose Rosas."

Dr. William Miller, the chairman of St. Luke's Department of Medicine, was involved in the hospital's internal investigation of Maria's complaint. On March 27, [petitioner] asked to meet with Dr. Miller and said he wanted to provide information he had previously withheld. [Petitioner] told Dr. Miller that the reason Maria's examination had taken so long was "'because it had become a sexual experience'" for her, and then for him, and that he had continued the exam to bring her to orgasm. Dr. Miller asked why [petitioner] had not stopped the exam when he perceived it was becoming sexual. [Petitioner] responded, "'I don't know what came over me. I just lost my mind.'" Dr. Miller also asked about the earlier matter with Claudia. [Petitioner] denied that it had also been sexual and said it was a different situation because he had not known Claudia as long. Dr. Miller then read [petitioner] his notes of the interview and [petitioner] affirmed they were correct.

[Petitioner] was later arrested. The police issued a press release about the charges against him in an effort to locate other possible victims.

*A.*

A. was born in Guatemala in 1940. [Petitioner] treated her for stomach pains in 2006. In May 2007 she made an appointment with him because she was having intense headaches. [Petitioner] said her blood pressure was very high, that she was too tense, and that he needed to examine her. He had A. unbutton her blouse and examined her breasts. Without providing her with a gown, [petitioner] told her to remove her pants and underwear. When she asked if this was necessary, [petitioner] insisted it was and that she would feel better after he examined her ovaries.

The next thing A. knew, [petitioner] "had already put his finger inside of me." It did not feel like a normal examination. [Petitioner] was "touching everything inside of me, but that was hurting, he was doing it really hard." When she said it hurt, [petitioner] told her to hold his hand so she "wouldn't feel it so much." [Petitioner] "was moving [his finger] in the same way that a man moves it when he's masturbating a woman." This went on for much longer than any pelvic exam A. had experienced before. Then [petitioner] told A. to turn over so he could check her spine. When she complied he kissed her buttocks, put his chin in the middle of her buttocks just below her lower back and moved it back and forth. Then he told A. that everything was fine, and that "doctors sometimes have to do things to help their patients." He said A. was "a very ardent woman" and hugged her after she got dressed. A. felt embarrassed and "really terrible."

A. left [petitioner]'s office and went straight to her job in Pacific Heights to prepare for a dinner party her employer was hosting that night. "I overcame the feelings that I was having and I went to do what I had to do. I had to do my duty." She did the shopping and cooked and served the dinner, trying to "erase from my mind what was happening to me . . . I had to concentrate on what I had to do." The party ended around 10:30 or 11:00 that night. A. did not feel strong enough to drive all the way to her home in Contra Costa County, so she drove to her friend Raquel C.'s house in Daly City to spend the night. While she was driving A. spoke to another friend, Rhina O., on the phone for about an hour.

When A. arrived at Raquel's she felt too ashamed to say what had happened. She had difficulty sleeping, and the next morning she called Rhina, who insisted she report what [petitioner] had done. Eventually A. agreed, and after work she and Rhina went to the police. After she spoke with police officers A. was taken to San Francisco General Hospital for a SART examination, still wearing her clothes from the previous day. DNA testing indicated a high likelihood that a substance collected from the inside of A.'s underwear was [petitioner]'s saliva.

[Petitioner] phoned A. several times the following weekend, but she did not answer his calls. On June 2 he called Raquel C., who was a former patient. He said he had been unable to reach A. and asked Raquel to locate her for him. Raquel agreed to call her. About 20 minutes later [petitioner] called back and explained that A. had left his office upset or angry a few days earlier. He said it was urgent that he talk to A. "because he had done something that wasn't right. That there had been a misunderstanding. And that [A.] had gone to file a complaint with the police, and that wasn't good for him. Because he was just now coming out of a trial due to some people who had accused him unfairly. And that he could give her some monetary compensation or help her financially in whatever way she wanted. And that if she didn't want to talk to him that she could talk to his lawyer, that they could reach an agreement. And that he would do whatever she wanted." Raquel discussed the call with A., who said she wanted nothing to do with [petitioner] or his lawyer.

[Petitioner] called Raquel again a couple of days later and asked whether she had spoken to A. When Raquel told him what A. had said he "begged" her to ask A. to contact his attorney. He said he was "very sorry." He wanted to apologize, and would do whatever A. wanted. [Petitioner] asked Raquel to try to "convince [A.] so that they could reach an agreement."

***Glenda***

Glenda was born in El Salvador in 1980. In 2004 she went to see [petitioner] because she was experiencing headaches. [Petitioner] gave her a referral for an MRI and told her to return to his office to go over the results. When she returned, [petitioner] told her the MRI did not show anything was wrong and that he needed to examine her. Glenda told him that she had had a pelvic examination and PAP smear the previous month, but he said as her doctor he had to examine her. [Petitioner] told Glenda to lower her pants and reached for the waist of her pants to unbutton them, so she unbuttoned them herself. She felt embarrassed and "dirty," but she continued with the exam "because he was the doctor."

[Petitioner] did not give Glenda a robe or drape. After she lowered her clothing to her knees, [petitioner] stuck his fingers in her vagina "really hard" for three or four minutes. He did not use a speculum. Glenda complained it was painful. Rosas said her ovaries were hurting, and that he wanted to "do [her] front." He said that doctors "aren't just doctors, we're friends," and that Glenda could tell him her problems. Glenda felt "horrible" and "dirty." When the exam was over she left the office quickly and never went back.

Glenda drove home to Daly City, where she lived with her sister Sonja.  She was crying and felt awful.  She told Sonja she had only gone to [petitioner] for her test results, but that he "touched me down there."  Sonja suggested she call the police, but Glenda thought that they would not believe her.

In 2005, Sonja told Glenda she had seen on the news that other women had complained about [petitioner].  About four days later Glenda told her boyfriend what had happened, and with his encouragement she reported her experience with [petitioner] to the police.

### M.

M. was born in El Salvador in 1951.  In 2001 she went to see [petitioner] because she had the flu.  [Petitioner] first checked M.'s ears, nose and throat.  Then he told her to lie face down on his table, lowered her pants and, without asking permission or telling her what he was going to do, inserted a finger into her anus.  M. said, "What's going on?"  [Petitioner] withdrew his finger and told her she had hemorrhoids.  M. pulled her pants up and the examination ended.  M. has never had hemorrhoids and was not experiencing any anal discomfort before the examination.

At a subsequent appointment with her gynecologist, Dr. Alvarado, M. mentioned that she had not felt comfortable when [petitioner] examined her.  Dr. Alvarado said M. had a right to tell her doctor she didn't like something if it didn't feel right, and that she could change doctors.  Later M. saw a television news report about [petitioner].  The next day she went to Dr. Alvarado's office and told the doctor's assistant, Sylvia, that she was considering contacting the police about [petitioner].  She ultimately decided against it because "in our country, we're not accustomed to doing that sort of thing."  A few days after M. spoke with Sylvia, investigators from the police and medical board came to her home and questioned her about [petitioner].

### The Defense Case

[Petitioner]'s wife and office manager, Norma Watanabe, testified that A. appeared "normal" when she left the clinic after her appointment with [petitioner].  Ana Guillen, [petitioner]'s medical assistant between July 2001 and October 2006, testified that none of [petitioner]'s patients ever complained of inappropriate behavior.  Dr. Alvarado testified that in February 2002 M. commented that her examination with [petitioner] had been different and uncomfortable because he had her lie face down, but Dr. Alvarado did not think the information triggered her duties as a mandatory reporter.  In 2004 Dr. Alvarado diagnosed M. with a minor case of internal hemorrhoids.

Three of [petitioner]'s long-term female patients praised him as a doctor and member of the community and testified that he never touched them inappropriately.  Lillian Paloma went to [petitioner] for medical care in December 2004 after Glenda, a colleague of Paloma's husband, referred her to him.  Around Christmas that year Glenda asked Paloma how her appointment with [petitioner] had gone, but she never told Paloma or her husband that [petitioner] had acted inappropriately with her.

7

1
2

*The Verdict*

The jury found [petitioner] guilty of unlawful sexual penetration of Maria and A. with an on-bail allegation as to A., unlawful touching as to A., four lesser included misdemeanor assaults against Claudia, one lesser included misdemeanor assault against Maria, and attempting to prevent and dissuade a witness as to A. [Petitioner] was acquitted of unlawful sexual penetration, assault and simple battery as to M., elder abuse as to A., sexual penetration and sexual assault by means of force likely to produce great bodily injury as to Claudia, and assault by means of force likely to produce great bodily injury as to Maria. The jury deadlocked on the sexual penetration as to Glenda, and that count was subsequently dismissed.

*People v. Rosas*, No. A129711, 2012 WL 1955717, at *1-5 (Cal. Ct. App. May 31, 2012).

### III. DISCUSSION

**A.      Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

United States District Court
Northern District of California

8

1    Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at

2    405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

3    the state court identifies the correct governing legal principle from [the Supreme] Court's

4    decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

5    "[A] federal habeas court may not issue the writ simply because that court concludes in its

6    independent judgment that the relevant state-court decision applied clearly established federal law

7    erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.

8           Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's

9    jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the

10   United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

11   as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  "A federal court

12   may not overrule a state court for simply holding a view different from its own, when the

13   precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17

14   (2003).

15          Petitioner's claims in this action were presented to the California Supreme Court only in

16   petitioner's state petition for writ of habeas corpus, which was summarily denied.  When presented

17   with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court

18   must conduct an independent review of the record to determine whether the state court decision is

19   objectively reasonable.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This

20   "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only

21   method by which [a federal court] can determine whether a silent state court decision is

22   objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Where a

23   state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still

24   must be met by showing there was no reasonable basis for the state court to deny relief."

25   *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

26   **B.    Petitioner's Claims**

27          Petitioner asserts that his trial counsel rendered ineffective assistance by: (1) failing to

28   procure a defense medical expert; (2) failing to investigate and call petitioner's office assistant as

United States District Court
Northern District of California

9

the primary custodian of the patient–victims' medical records; (3) failing to call a defense forensic DNA expert and to effectively cross-examine the prosecutor's DNA expert; (4) failing to call Inspector Kidd and Dr. Yap regarding Claudia; (5) failing to call medical board investigator Moya regarding his investigation tactics; and (6) failing to call and effectively cross-examine Inspector Lee.  Pet. at 10.[5]

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*. at 686.  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id*. at 687-88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

---

[5] On June 30, 2015, subsequent to filing his traverse, petitioner filed documents from his re-sentencing, for which he was appointed new counsel.  The documents show that he was re-sentenced to 8 years in state prison on September 10, 2012, but that a corrected abstract of judgment was filed on April 2, 2014, giving petitioner a 12 year sentence, i.e., a term longer than his original sentence.  *See* Dkt. No. 31.  Petitioner states, "I don't know if this is another form of ineffective assistance of counsel."  *See id.* at 2.  Petitioner is advised that he cannot now amend his petition to add a new ineffective assistance of counsel claim based on the actions of his new counsel at re-sentencing.  *See Mayle v. Felix*, 545 U.S. 644, 655-56 (2005) (after AEDPA's one-year statute of limitations has run amendments can be made only when the original and amended pleadings "'ar[i]se out of the same conduct, transaction, or occurrence.'") (quoting Fed. R. Civ. P. 15(c)(2)).  Petitioner may, however, attempt to bring a separate habeas action asserting a new ineffective assistance counsel claim.  28 U.S.C. § 2254's restrictions on second or successive habeas petitions are not applicable to a challenge to a new sentence after an earlier sentence was vacated.  *Magwood v. Patterson*, 561 U.S. 320, 342 (2010) (finding challenge to new sentence after subsequent sentencing hearing not second or successive under § 2244(b)); *see Wentzell v. Neven*, 674 F.3d 1124, 1126-27, 1128 (9th Cir. 2012) (holding that petition was not "second or successive" under AEDPA because it was the first petition to challenge a new, intervening judgment of conviction that was entered after the initial, partially successful habeas petition led to a new, amended judgment).

United States District Court
Northern District of California

10

1    that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

2    proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is a

3    probability sufficient to undermine confidence in the outcome. *Id.*  "The likelihood of a different

4    result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466

5    U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel

6    claim on habeas review to address the prejudice prong, i.e., the second factor of the *Strickland* test,

7    if the petitioner cannot establish incompetence, as required under the first prong.  *Siripongs v.*

8    *Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

9         The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential, and

10   when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks

11   omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable.

12   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s

13   deferential standard." *Id.*

14        "[S]trategic choices made after thorough investigation of law and facts relevant to

15   plausible options are virtually unchallengeable; and strategic choices made after less than

16   complete investigation are reasonable precisely to the extent that reasonable professional

17   judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.  "In any

18   ineffectiveness case, a particular decision not to investigate must be directly assessed for

19   reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

20   judgments." *Id.* at 691.

21        That an attorney might have conducted a more thorough investigation does not establish

22   deficient performance. *Burger v. Kemp*, 483 U.S. 776, 794 (1987).  "[T]he duty to investigate

23   does not force defense lawyers to scour the globe on the off chance something will turn up;

24   reasonably diligent counsel may draw a line when they have good reason to think further

25   investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  The question is

26   not what the best lawyer or even what most good lawyers would have done, but whether a

27   reasonable lawyer could have acted as defense counsel did. *Coleman v. Calderon*, 150 F.3d 1105,

28   1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998).  Thus, the relevant inquiry is not

United States District Court
Northern District of California

11

1    what trial counsel could have done, but whether counsel's actions were reasonable.  *Babbitt v.*

2    *Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998).

3         To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a

4    federal habeas petitioner must identify the witness, provide the testimony the witness would have

5    given, show the witness was likely to have been available to testify and would have given the

6    proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony

7    been introduced, the jury would have reached a verdict more favorable to the petitioner.  *See*

8    *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that

9    the witness would have given helpful information if interviewed by counsel and called to the stand

10   is not enough to establish ineffective assistance.  *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th

11   Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

12        In *Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's

13   claim that his counsel had been ineffective in failing to investigate and call a witness, where the

14   petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an

15   affidavit from [the] alleged witness," that the witness would have given helpful testimony.  *Id.* at

16   486-87; *cf. Alcala*, 334 F.3d at 872 & n.3 (distinguishing, inter alia, *Dows*; finding ineffective

17   assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses

18   would have provided).

19        The Court next addresses each ineffective assistance of counsel claim.

20        **1.       Decision Not to Obtain a Defense Expert**

21        Petitioner claims that his counsel rendered ineffective assistance by failing to procure a

22   defense medical expert.  Petitioner contends that a defense expert could have reviewed the medical

23   records of Glenda and Claudia and testified that they were fabricating their claims that petitioner

24   had sexually assaulted them during their examinations.  Petitioner further contends that a defense

25   expert could have testified that it is a "normal medical [] procedure for a doctor to externally

26   examine a patient's sacrum area without gloves," thereby undermining the incriminating nature of

27   the evidence of petitioner's DNA found in the sacrum area of A.'s underwear.  Pet. at 11-14.

28        The state court had a reasonable basis to deny this claim because counsel could have

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   reasonably believed that obtaining an expert for the purposes proposed by petitioner would have

2   been unsuccessful.  First, an expert's review of petitioner's medical files had little to no probative

3   value.  The medical records of petitioner's examination of Claudia and Glenda prepared by

4   petitioner were nothing more than self-serving statements.  *See Bray v. Andrews*, 640 F.3d 731,

5   738-39 (6th Cir. 2011) (holding that the state court was not unreasonable in finding that the self-

6   serving statements of petitioner did not support a claim of ineffective assistance of counsel).

7          Moreover, the proposed defense expert testimony would not have been admissible to prove

8   the untruthfulness of Glenda's or Claudia's testimony.  Under California law,

9          If a witness testifying as an expert, his testimony in the form of an opinion is
10         limited to such an opinion as is:

11         (a) Related to a subject that is sufficiently beyond common experience that the
           opinion of an expert would assist the trier of fact; and

12         (b) Based on matter (including his special knowledge, skill, experience, training, and
13         education) perceived by or personally known to the witness or made known to him at or
           before the hearing, whether or not admissible, that is of a type that reasonably may be
14         relied upon by an expert in forming an opinion upon the subject to which his testimony
           relates, unless an expert is precluded by law from using such matter as a basis for his
15         opinion.

16  Cal. Evid. Code § 801.  "[A]n expert may not give an opinion whether a witness is telling the truth

17  [or not], for the determination of credibility is not a subject sufficiently beyond common

18  experience that the expert's opinion would assist the trier of fact; in other words, the jury generally

19  is as well equipped as the expert to discern whether a witness is being truthful."  *People v.*

20  *Coffman*, 34 Cal. 4th 1, 82 (2004).  Defense counsel cannot be deemed ineffective for failing to

21  introduce inadmissible testimony.  *See Rupe v. Wood*, 93 F.3d 1435, 1445 (9th Cir. 1996) ("[T]he

22  failure to take a futile action can never be deficient performance.").

23         Regarding petitioner's claim that an expert could have testified on the normal medical

24  procedure for conducting a pelvic examination, such evidence was not relevant.  Under California

25  law, "'[r]elevant evidence' means evidence, including evidence relevant to the credibility of a

26  witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact

27  that is of consequence to the determination of the action."  Cal. Evid. Code § 210.  Here, the DNA

28  evidence found on the inside of A.'s underwear was presumptive for petitioner's saliva.  RT at

13

United States District Court
Northern District of California

1539-40, 1552, 1572, 1585-87, 1594, 1603, 1609.  Consequently, whether it was "normal" for a doctor to examine a patient's sacrum area without gloves had no tendency to discredit the evidence, as it clearly is not "normal" for a doctor to take any action that would result in saliva being found in that area.

Turning to *Strickland*'s second prong, petitioner cannot show prejudice.  First, petitioner has offered no evidence that a defense medical expert would have provided favorable testimony at trial.  He fails to offer a declaration from an expert setting forth the testimony to be offered, which is fatal to any showing of prejudice.  *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (where petitioner contended he might have some type of organic brain dysfunction but offered no expert declaration that he in fact suffered from it, "This speculation is not sufficient to establish prejudice."); *Gonzalez v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008) (petitioner argued "that *if* tests had been done, and *if* they had shown evidence of some brain damage or trauma, *it might have* resulted in a lower sentence.  Such speculation is plainly insufficient to establish prejudice."); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").

Further, petitioner cannot show prejudice from the absence of a defense medical expert because, even with such an expert, the evidence against him was overwhelming.  Each victim testified as to how petitioner had sexually assaulted her.  *See* RT at 1131-34, 1167-69 (Claudia's testimony regarding petitioner's penetration of her vagina and anus after he put her in the knee-chest position); RT at 1206-31 (Maria's testimony that petitioner touched her clitoris, put her in a knee-chest position, sexually penetrated her vagina "pushing in and going around," and caused her to bleed and have pain); RT at 1377-79, 1381 (Glenda's testimony regarding petitioner's hard penetration of her vagina causing her pain); RT at 1478-82 (A.'s testimony regarding petitioner's penetration and masturbation of her vagina and his kissing of her buttocks).[6]  This evidence was

---

[6] Although petitioner was ultimately not convicted of the charges against Glenda, and in this claim does not appear to challenge his conviction relating to Maria, under California law, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses [is admissible]."  Cal. Evid. Code § 1108(a).  Thus, evidence of each assault was admissible to prove the other assaults.

1    sufficient by itself to convict petitioner of the various charged offenses.  *See* CALCRIM No. 1190

2    ("Conviction of a sexual assault crime may be based on the testimony of a complaining witness

3    alone.").

4           Significantly, the victims' testimony was consistent with the complaints that they made to

5    others about petitioner's sexual assaults.  *See* RT at 1181-82, 1184, 1198-99 (Maria V.'s testimony

6    regarding Claudia's statement made immediately after the assault); RT at 1320-21 (Dr. Snyder's

7    testimony regarding Maria's statement made the day after the assault); RT at 1291-93 (the SART

8    nurse's testimony regarding Maria's statement made the day after the assault); RT at 1638-44 (Dr.

9    Nicol's testimony regarding Maria's statement made the day after the assault); RT at 1415-17

10   (Glenda's sister's testimony regarding Glenda's statement immediately after the assault); RT at

11   1510-11, 1514, 1517 (Rhina O.'s testimony regarding A.'s statement on the evening following the

12   assault).  These prompt, consistent reports to others of the sexual abuse strengthened the

13   credibility of the victims' claims.

14          There was also a significant amount of corroborating evidence.  This included petitioner's

15   own admission to Raquel C. that he "had done something that wasn't right" to A. and his attempts

16   through Raquel C. to silence A. in exchange for money.  RT at 1522-26.  There was also evidence

17   of a prior uncharged sexual offense against another female patient (Audelia) in 2002.  RT at 1453-

18   57, 1460, 1466-67.  Furthermore, in the case of A., petitioner's DNA was found on the back inside

19   rear panel of her underwear and it was "highly likely" that the DNA came from petitioner's saliva.

20   RT at 1539-40, 1552, 1572, 1585-87, 1594, 1603, 1609.  In addition, Dr. Nicol testified that it is

21   never appropriate for a doctor to masturbate his patient, keep his fingers inside her vagina for an

22   extended period of time, or kiss his patient.  RT at 1668-72.  In the case of Claudia, Dr. Nicol

23   opined that it is uncommon for a general practitioner to give a new patient a pelvic examination on

24   her first visit while he is still getting to know the patient and her medical history.  RT at 1657-59.

25   Dr. Nicol added that the knee-chest position would have been painful to Claudia, who had

26   reported to petitioner that she was experiencing back pain.  RT at 1660.

27          In Maria's case, the swelling, laceration, redness, and bruising in her vaginal area, along

28   with her complaint of vaginal pain, corroborated her claim that petitioner had sexually assaulted

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   her.  RT at 1291, 1294-99, 1318-20, 1644, 1732.  The evidence included petitioner's apology letter

2   to Maria for having given her an "inappropriate exam."  RT at 1532-35.  Petitioner also admitted

3   to Dr. Miller that his examination of Maria was sexual and said that he did not stop because he

4   "lost [his] mind" while he was examining her.  RT at 1346, 1365-66.  The evidence showed that

5   petitioner was well aware that his misconduct could lead to a report to the state medical board and

6   eventually end his career as a doctor.  RT at 1347-48.  In sum, given the overwhelming evidence

7   against petitioner, the admission of defense expert testimony would likely not have yielded a more

8   favorable result.  *Strickland*, 466 U.S. at 694.

9          Accordingly, petitioner is not entitled to habeas relief on this claim.

10          **2.**        **Decision Not to Call Petitioner's Office Assistant**

11          Petitioner claims that his counsel rendered ineffective assistance by failing to call his office

12   assistant as the primary custodian of the patient–victims' medical records so that the complete

13   medical records of the patient–victims could be introduced to show that no sexual abuse had

14   occurred during their examinations.  Pet. at 14-17.

15          This claim fails because the state court could have reasonably concluded that counsel

16   reasonably decided to forgo introducing the complete medical records.  As discussed above, the

17   medical records were prepared by petitioner and thus were nothing more than self-serving

18   statements made by petitioner to suggest that he had not abused his patients.  *See Bray*, 640 F.3d at

19   738-39.  Additionally, although the patient–victims' medical records documented no assaultive

20   behavior, another reason counsel may have decided not to introduce them was because some of the

21   records did support the prosecutor's theory.  This is because many of the records showed that

22   petitioner had conducted anal and vaginal examinations of patient–victims who had come to see

23   him for ailments (such as headaches, back pain, the flu, and shoulder pain) that did not require

24   such examinations for purposes of treatment.  *See* Pet. Exs. A-B, D-F.  Thus deciding not to

25   introduce the medical records does not demonstrate incompetence, but was instead a rational

26   tactical choice.  *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam) (habeas court must

27   consider "*all* the relevant evidence that the jury would have had before it if [counsel] had pursued

28   the different path," and it is reasonable for counsel to limit introduction of evidence that would

16

1    assist the prosecution); *Richter*, 562 U.S. at 109 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8

2    (2003) ("There is a 'strong presumption' that counsel's attention to certain issues to the exclusion

3    of others reflects trial tactics rather than 'sheer neglect.'").

4         Finally, the state court could have reasonably concluded that no relief was warranted

5    because petitioner failed to demonstrate prejudice.  As discussed above, the evidence tying

6    petitioner to the crimes was strong enough that admission of the medical records would likely not

7    have yielded a more favorable result.  *Strickland*, 466 U.S. at 694.

8         Accordingly, petitioner is not entitled to habeas relief on this claim.

9
         **3.    The Cross-Examination of the Prosecutor's DNA Expert and the Decision Not**
10             **to Call a Defense DNA Expert**

11        Petitioner claims that his counsel rendered ineffective assistance by failing to call a defense

12   DNA expert and by not effectively cross-examining the prosecutor's DNA expert, Ms. Boland.

13   Specifically, petitioner claims that had defense counsel effectively cross-examined Ms. Boland, he

14   would have been able to elicit her testimony that the DNA test performed on A.'s underwear was

15   "presumptive" for saliva and not conclusive.  Petitioner further claims that had his counsel

16   obtained a defense DNA expert, that expert would have been able to undermine the testimony of

17   Ms. Boland whom he claims gave misleading testimony.  Pet. at 17-20.

18        The state court had a reasonable basis to deny this claim.  First, contrary to petitioner's

19   claim, Ms. Boland did not provide misleading testimony regarding the DNA found on A.'s

20   underwear.  To the contrary, the record shows that Ms. Boland made it clear that A.'s underwear

21   tested "presumptively" for saliva.  In doing so, Ms. Boland initially explained that amylase is an

22   enzyme that is found in high concentrations in saliva, but is also found in low levels in other body

23   fluids such as blood, sweat, tears, fecal matter, and the pancreas.  RT at 1565.  Ms. Boland

24   specifically stated that the DNA found on A.'s underwear tested positive for the presence of

25   amylase in the first test and "presumptively" positive for saliva in the second test.  RT at 1566-67.

26   Ms. Boland made it clear that the San Francisco crime laboratory does not use the second test as a

27   "confirmatory test for saliva."  RT at 1567.  Ms. Boland explained: "There have been documented

28   reports in the forensic community that breast milk, as well as fecal material, will react . . . so just

United States District Court
Northern District of California

1    to be very conservative we say it's a presumptive test, although the manufacturer still says it is a

2    confirmatory test for human saliva." RT at 1567.[7]

3         Further, the record demonstrates that defense counsel did effectively cross-examine

4    Ms. Boland. Defense counsel specifically asked and Ms. Boland confirmed that the tests used by

5    the San Francisco crime laboratory constituted a screening, not a confirmatory test for saliva,

6    adding, "we call it a presumptive test." RT at 1595. Defense counsel also asked whether anything

7    was done to differentiate between a possible DNA mixture of saliva and urine on the underwear.

8    RT at 1596. Ms. Boland made it clear that the San Francisco crime laboratory had not done

9    anything to make such a distinction, explaining that she expected A.'s skin cells, not urine, to be

10   on the inside back panel of A.'s underwear and reiterated that the manufacturer indicated there

11   was "no cross reactivity with urine." RT at 1596. Trial counsel did not demonstrate incompetence

12   by deciding to address the accuracy of the DNA testing through cross-examination, rather than

13   through defense expert testimony. Defense expert testimony was not guaranteed to be helpful to

14   the defense, especially after it was subjected to cross-examination. *See Richter*, 562 U.S. at 111

15   ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for

16   every prosecution expert an equal and opposite expert from the defense. In many instances cross-

17   examination will be sufficient to expose defects in an expert's presentation."); *Bonin v. Calderon*,

18   59 F.3d 815, 834 (9th Cir. 1995) ("while the Constitution requires that a criminal defendant

19   receive effective assistance of counsel, the presentation of expert testimony is not necessarily an

20   essential ingredient of a reasonably competent defense").

21        Finally, petitioner again fails to establish prejudice. He provides no declaration from any

22   expert stating how he or she would have testified at trial, which is fatal to his claim. *See Dows*,

23   211 F.3d at 486; *Grisby*, 130 F.3d at 373 (noting "[s]peculation about what an expert could have

24   said is not enough to establish prejudice"). And as discussed above, the evidence of petitioner's

25   guilt was so overwhelming that, even assuming a defense expert had been retained, it cannot be

26

27

28   [7] Ms. Boland was referring to the manufacturer of the test employed by the San Francisco crime laboratory. *See* RT at 1566-67.

United States District Court
Northern District of California

1    said that his or her testimony would likely have yielded a more favorable result.  *Strickland*, 466

2    U.S. at 694.[8]

3           Accordingly, petitioner is not entitled to habeas relief on this claim.

4           **4.        Decision Not to Call Inspector Kidd and Dr. Yap as Witnesses**

5           Petitioner claims that his counsel rendered ineffective assistance by failing to call

6    Inspector Kidd of the San Francisco Police Department and Dr. Yap of the Medical Board of

7    California regarding their earlier investigation of Claudia's claims of sexual assault by petitioner

8    in 2002, which led to no charges being filed and no revocation of petitioner's medical license at

9    that time.  Pet. at 20-22.

10          The state court had a reasonable basis to deny this claim.  Contrary to petitioner's claim,

11   the record shows that defense counsel did in fact highlight the fact that petitioner was not arrested

12   in 2002 following Claudia's 2002 report of sexual abuse.  Specifically, defense counsel elicited

13   Inspector Lee's testimony on cross-examination that no arrest warrant was issued in 2002 in

14   relation to Claudia's claims against petitioner and that the case was "closed" later in 2002.  RT at

15   1543.

16          Furthermore, defense counsel's decision not to introduce evidence of the initial

17   investigation into Claudia's claims of sexual abuse by petitioner in 2002 was a reasonable tactical

18   decision.  The record shows that when Claudia initially reported the sexual abuse, the chief of

19   medicine at St. Luke's Hospital thereafter reprimanded petitioner, advised him to use the

20   conventional lithotomy position with his female patients, and advised him to have a chaperone

21   present during future pelvic exams of his female patients.  RT at 1750-51.  Further, Dr. Yap's

22   memorandum finding insufficient evidence to support the 2002 allegations includes admissions by

23

24   ───────────────

      [8] Petitioner tacks on an argument that defense counsel failed to request the processing of DNA
25   taken from vaginal swabs during a May 31, 2007 gynecological examination of A.  Pet. at 8;
      Traverse at 10.  Petitioner offers only his own conclusory statements and fails to provide a factual
26   showing that his trial counsel in fact failed to request the testing or that the evidence to be gleaned
      therefrom was even exculpatory.  Petitioner thus fails to show ineffectiveness on the part of
27   defense counsel.  *See United States v. Schaflander*, 743 F.2d 714, 721 (9th Cir. 1984) (holding
      petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel
28   claim).  In any event, the state court had reasonable grounds to deny this claim for lack of
      prejudice.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   petitioner that could have hurt his case.  *See* Pet. Ex. K.  Specifically, petitioner admitted to

2   examining Claudia without a chaperone and without providing her a gown.  *Id.*  Petitioner also

3   admitted placing Claudia in a genupectoral (knee-chest) position for the purpose of examining her

4   rectum and vagina.  *Id.*  This was a position that would have caused Claudia discomfort as she was

5   already complaining of back pain.  *See* RT at 1660.  Defense counsel may well have reasoned that

6   it was not helpful to focus on the 2002 events given that they opened the door to evidence that

7   would have helped the prosecution.  *See Wong*, 558 U.S. at 20.

8        Finally, petitioner again fails to establish prejudice.  Petitioner presents no declaration

9   from either Inspector Kidd or Dr. Yap stating that they were available to defense counsel in

10  preparation for trial and that they would have testified in the manner petitioner now claims.  *Allen*,

11  395 F.3d at 1002 n.2; *Dows*, 211 F.3d at 486.  Nor is there a reasonable probability that their

12  testimony would have resulted in a different verdict.  The jury had already heard from Inspector

13  Lee that charges were not filed against petitioner when Claudia first reported to authorities

14  petitioner's assault.  RT at 1543.  And there was sufficient evidence to support the jury's verdict

15  with respect to Claudia.

16       Accordingly, petitioner is not entitled to habeas relief on this claim.

17  **5.    Decision Not to Call Investigator Moya as a Defense Witness**

18       Petitioner claims that his counsel rendered ineffective assistance by failing to call

19  Medical Board of California Investigator Moya regarding his investigation tactics, which

20  purportedly changed after he learned that a new complaint of sexual assault had been made against

21  petitioner by Maria.  Specifically, petitioner claims that despite Dr. Yap's determination in 2003

22  that Claudia's 2002 complaint against petitioner was insufficient to support an allegation,

23  Investigator Moya used "rogue investigations" and "tainted taped interviews" to later substantiate

24  Claudia's complaint after Maria lodged her complaint in 2005.  Petitioner also alleges that

25  Investigator Moya conducted "tainted taped interviews" of Claudia's friend Maria V., Glenda, and

26  M. and that Investigator Moya used "biased investigative tactics" and "suspicious interrogation

27  techniques." Pet. 22-24.

28

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

The state court had a reasonable basis to deny this claim.  There is no evidence that Investigator Moya sought out any of the victims before they made their reports to the hospital and police, and there is no evidence that Investigator Moya used any improper tactics to persuade any victim to make false claims against petitioner.  Petitioner thus fails to make a sufficient factual showing to substantiate his ineffective assistance of counsel claim.  *See Schaflander*, 743 F.2d at 721.

Petitioner points to the testimony of Dr. Margarita Alvarado, a St. Luke's gynecologist with whom M. discussed her 2001 examination by petitioner, mentioning that it was not comfortable.  RT at 1846-51.  At trial, Dr. Alvarado testified that she felt threatened by some comments Inspector Moya made after she told him that she had received no other complaints about the way petitioner had been conducting his examinations.  RT at 1848-50.  Notwithstanding Dr. Alvarado's reaction to the comments, her testimony did not in any way establish that Investigator Moya used investigatory techniques that should have been subjected to further scrutiny by defense counsel at trial.

Indeed, had the defense called Investigator Moya as a witness, the prosecutor would have had the opportunity to elicit the following additional incriminating evidence against petitioner on his cross-examination of Investigator Moya: during an unannounced visit at petitioner's medical office, Investigator Moya saw a female patient exit an examination room with petitioner with no chaperone in violation of the court's order that petitioner conduct all physical examinations of his female patients with a chaperone present.  RT at 10-12.  Thus, defense counsel made a sound tactical decision not to call Investigator Moya as a defense witness.  *See Wong*, 558 U.S. at 20.

Further, petitioner again fails to establish prejudice.  The jury heard the testimony of the victims themselves and the friends and doctors to whom they reported the assaults.  This evidence, along with abundant other evidence, supported the verdicts.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**6.      Decision Not to Call Inspector Lee as a Defense Witness**

Petitioner claims that counsel rendered ineffective assistance by failing to call and effectively cross-examine Inspector Lee to show that he pressured petitioner to write an apology

21

letter to Maria, which was later used as evidence against him, and used "suspicious" tactics in his investigation of the accusations made by Glenda.  Pet. at 24-26.

The state court had a reasonable basis to deny this claim.  There is no evidence that Inspector Lee pressured petitioner to write a letter of apology to Maria when Lee interviewed him on March 24, 2005.  RT at 1532-35.  To the contrary, the evidence shows that petitioner voluntarily met with Inspector Lee, cooperated during the interview, wrote a letter of apology to Maria voluntarily in both Spanish and English, was free to leave after the interview, and did so. RT at 1532-35, 1541.

Regarding the investigation of Glenda, petitioner attaches transcripts of Inspector Lee's interviews with Glenda.  There is nothing in the transcripts showing that Inspector Lee used any improper tactics to persuade Glenda to make false claims against petitioner.  Petitioner argues that Inspector Lee failed to re-interview Glenda after reviewing her medical records, even though these records contradicted her interview statements.  As noted above, however, the medical records were prepared by petitioner and were therefore nothing more than self-serving statements with no tendency to discredit Glenda's own statements.  Regarding petitioner's argument that counsel should have highlighted the fact that Glenda did not file a complaint until eight months after her examination, the jury likely would have understood that she did not feel comfortable reporting the incident until she had learned in the news that other women were complaining of sexual assault by petitioner.

Further, petitioner again fails to establish prejudice.  There was not a reasonable probability that the jury would have reached a different result had defense counsel questioned Inspector Lee differently.  As indicated above, there was no evidence to indicate that Inspector Lee had coerced or pressured petitioner or Glenda in any way.  In addition, the evidence against petitioner was overwhelming.[9]

Accordingly, petitioner is not entitled to habeas relief on this claim.

_____

[9] With respect to Glenda, it is significant that petitioner was *not* convicted of the sexual assault (count 6).  The jury deadlocked on this count, which was subsequently dismissed at the prosecutor's request.  CT at 445, 673.  Thus, it is evident that no prejudice ensued as to this count.

22

United States District Court
Northern District of California

**C.     Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden John Rathman on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated:  11/17/2015

HAYWOOD S. GILLIAM, JR.
United States District Judge